Trooper Robert Burke of the Maine State Police was not allowed to delay the roadside stop that he made of a passenger van containing about 11 people for the amount of time that it took for Immigration and Customs Enforcement officials to determine whether there was probable cause that a member in that van had illegally re-entered the United States. In this matter, the District Court found that probable cause was present as of about 25 minutes into the stop. This finding is error. There was no connection between the information contained in the Immigration and Customs Enforcement databases and the actual person who was present on the side of the road. Until they had information that connected the two people, there was no possibility of probable cause. This didn't happen until the agents had arrived and it took them almost an hour and 35 minutes for them to arrive at the scene. Okay, so the traffic stop was obviously acceptable. Was it a State Trooper thought he had seen seat belt violations? So he pulls over a van and he finds it's filled with what, 10 or 12 people? I believe it was 11. Okay, well I was on target. So there are 11 people and none of them apparently are wearing seat belts. So they're all subject to citation under Maine law. And he is trying to find out if any of them have driver's licenses. The driver of the van does not. So that's another reason to think there's a violation of State law. And then he starts asking for identifications and it's a little bit difficult. There are language problems. The people are not primarily English speakers. And they start pulling out consular identifications. I don't remember what the record says about the other stuff. So the trooper is trying to find out who these people are, if there's any record associated with them. So I don't understand the argument that probable cause hasn't been developed during the course of this. Judge Lynch, so the argument is precisely that if he had stopped them for seat belt violations, and while there is some issue over credibility, he said, the trooper Burke said that he pulled them over because he saw a cracked windshield and a seat belt violation. The district court was not willing to credit trooper Burke's observation that he testified to that there was a cracked windshield. When he coached the van and he asked, are you wearing your seat belt? Someone responded, yeah. So I don't know that everyone wasn't wearing a seat belt and some people weren't. But what he did next is the crux of why probable cause becomes important. He doesn't go and start filling out seat belt violations or traffic citations or even request driver licenses from the actual driver. What he does is he stops the van, he finds out if anyone speaks English, and then he goes and he calls ICE. And what he says to the person, he uses his personal cell phone to make that call, what he says to that person is, Elliot, he addresses him by his first name, this is someone that he knows, and says, I have, well, he uses an epitaph, and depersonalizes or dehumanizes those people, and then says, I'm not sure what to do, and Elliot says, can you go get identification? And he says, hold on, I'll be right back. Now I think that's important because Rodriguez says you have to proceed with the justification for the stop and the tasks associated with that, and you can't deviate. If probable cause or even reasonable articulable suspicion were to develop in the meantime, then that would be permissible under Rodriguez to extend the stop, but that's not what we have here. We have a state trooper who's deviating from the purpose of the stop almost immediately. Well, but the stop has acquired a second purpose, which materialized once he found the circumstances of the people in the bus. I mean, no one spoke English. I think that if the driver was unlicensed, as I recall, and there was certainly at that point reason to say, is there an immigration violation going on here? And he acted, I would suppose, within reasonable limits of time in pursuing that second and new issue. I disagree with you, Justice Souter, and the reason that I disagree with you is because... A brave man. The reason is that it's not permissible, right, to assume that a nonwhite person who does not speak English is an immigrant. I don't think that that... That may be, but a van load with no one who speaks English and an unlicensed driver, something is unusual about that. Well, it may be unusual, but I think that the regulations would require Trooper Burke to have had some training to arrest them for the purpose of an immigration hold, which is the only problem he has at that point. At that point, they were being detained in the kind of Terry detention, and they were doing so, and the question is whether they were doing so beyond a reasonable time to either allay or confirm the suspicion. And I think the reasonable time issue with respect to an inquiry into the immigration laws is the issue upon which you've either got to win or lose. I agree with that, Justice Souter. And for me, the issue here is whether those databases were reliable and sufficient for that finding of probable cause. Is there any reason to believe there were not? There is. And what I argued before the district court was that this court had decided that these very same immigration databases did not provide probable cause for someone to be arrested. And that finding, and bringing it to the attention of the district court, I think meets what was meant in Herring as information showing that these databases were unreliable, and it then became the burden of the government to prove that they were otherwise reliable and should be reliable. Counsel, I think you just shifted grounds in your argument. Your first argument was he lacked any basis to switch from main traffic violations to inquiry about immigration status. Your second argument is, well, that wasn't the problem. The problem is he didn't consult accurate information. So which argument are you making? I don't think they're exclusive, Your Honor. I think that the first one is that the stop wasn't justified. It's always good to have a fallback argument. Judge Kayada, I think, had a question for you. Judge Singal had a practical observation. I think what you want suppressed is his identification. That is correct. And then the indictment dismissed. That is correct. I think Judge Singal pointed out, had you succeeded in that, he would have suppressed the identification, dismissed the indictment. Your fellow would have walked to the door of the courtroom. He then would have been arrested and recharged based on the fact that his identity was obviously known at that point. Which leads me to observe, I don't think we've ever had a case in which we've suppressed a person's self-identification. When I'm looking to suppress, and I need to be very careful here because it's the evidence of who he is that I'm asking to be suppressed. I'm asking for his A file to be suppressed. I'm asking for his fingerprints to be suppressed. And I'm asking for his statements to be suppressed. Without that information, it's impossible for anyone to decide that he's here in this country illegally. His statements included his statement as to who he was. That is correct. But in the courtroom he identified himself. He's sitting at counsel table, and so the ICE officials could arrest him as he walked out of the courtroom. And I think that the split between the circuit, I understand that the court has agreed with the suggestion that the continuing nature of the violation, which is something that is from this court's precedence, matters here. I don't think it does. So how do we get around Navarro trial? Well, I think that the problem here is that the stop itself is unconstitutional, and all of that sort of connected activity is also suppressible. And I think that that's the nature of the split between circuits. You reserve two minutes. Thank you, Your Honor. Good morning. Good morning. May it please the Court, Julia Lopez for the United States. Your Honors, there simply was no Fourth Amendment violation in this case, and as we argued in the alternative in our brief, even if there were, for the reasons that my colleague was just discussing with Judge Kayada. Looking first at the stop and the question of whether there was a Fourth Amendment violation, as has been discussed, the mission of this stop quickly became twofold. It was to address what appeared to be seat belt violations by a number of individuals. It was to address what appeared to be the problem of an unlicensed driver. And given the information that Trooper Burke developed very quickly upon stopping this van, it was permissible for him to take the step of calling ICE to help with identification of these individuals. My colleague had said something that I think is not consistent with the record, which is that he immediately called ICE and didn't even ask for IDs. That's not correct. If you look at the transcript of the video, the video itself, the first thing this trooper does is go to the car, ask for the driver's ID, registration, insurance. He notes that people are not wearing seat belts. He asks everyone for IDs. He spends a little time trying to communicate with them. And I believe indicates to them, okay, everybody get out your IDs. And he goes back to his cruiser and at that point calls ICE, while presumably he's letting the folks in the van find their identification. And I will note that even when he went back a second time to try to retrieve those IDs, he did not successfully retrieve very many. It took quite a long time for everyone to produce their IDs. So during this period of time that he's trying to identify people and have ICE's assistance with that, ICE does come back with the fact that Mr. Garcia Zabala had illegally reentered the country. That's within, I believe, the record shows, 21 minutes of the stop. We believe that Judge Engel's finding here is that probable cause developed well within a reasonable period here and there was no unduly lengthy detention. In terms of the question of whether probable cause was valid, my colleague has just argued that there was no connection between the information in the ICE databases and the individual on the side of the road. Mr. Garcia Zabala provided his consular ID to the trooper, and that was information that ICE used to determine that he had illegally reentered the country. We would submit that that is ample probable cause. It is not the case that I am aware that this court has ever held that ICE databases are presumptively unreliable. And as Judge Engel found, there is nothing in the record here to suggest in any way that the databases were unreliable. And in fact, the information gathered in this case, as to Mr. Garcia Zabala, was accurate. One thing I'm curious about, he later argues there's a Rule 5a violation, and your response is no. He was held in civil detention by ICE for roughly 10 days. But the record says that the reason for the length of the detention was the inability of the local agents to get his actual File A, was it? Yes, Your Honor. They waited, I believe, a week for the A file, requested it on a Friday. So I don't understand. Is this stuff not computerized? I believe what's shown in the record by the testimony of Officer Linott is that there's actually a physical A file with physical documents related to the prior removal that's necessary in order to refer the case to the U.S. Attorney's Office for prosecution. And the contents of that file are not contained in an electronic record? Well, I think what the record shows, Your Honor, is that yes, the databases included the information contained on that file, and that's what they used for probable cause in this case. But that the U.S. Attorney's Office required the agent to actually physically review the file before referring. And that's a policy of the U.S. Attorney's Office? Well, I don't want to... Not to trust the database, but to require the actual paper file? Yeah, I don't want to step outside the record too much, Your Honor, but I... No, but you represent the U.S. Attorney's Office. I do, Your Honor. My understanding is that typically, yes, we do require a review of the physical file. I will note that that is a procedure that has been blessed by this court, both in Tejada and Carnacion. It was the exact same procedure that was followed in both of those cases. But I'm wondering whether that's evidence that somehow the electronic files are, in fact, unreliable. No, Your Honor, I don't think so. The question of whether there's probable cause to arrest someone is different than what, for example, my office would use in determining whether to charge someone. Typically, we'd want to make sure that we could prove the case beyond a reasonable doubt, which, of course, is a different standard than probable cause for arrest. And so I would say that that is just to verify that all the necessary documentation is there before going forward with criminal charges. Again, the delay here was 13 days. I think some of that is explained by the fact that there were two weekends intervening. The traffic stop was on a Saturday. I believe the A file arrived the next Friday. The agent had provided the information to the U.S. Attorney's Office for preparation of a complaint on the following Monday. Tejada, I think, was a 16-day delay, and Carnacion was an 8-day delay. So we're right in the middle of those two precedents in terms of what is permissible. I'll also note that precedent seems to suggest that even in the case of a Rule 5 violation, dismissal is not an appropriate remedy unless some sort of prejudice has been shown. Of course, we wouldn't have to reach that issue if we accept your argument that this was a civil detention and the rule doesn't apply. Our precedents suggest, I believe in DICTA, that it might be different if ICE were somehow deliberately delaying the presentment where there are other criminal charges than immigration charges to be faced. I was just having a little trouble understanding such a scenario because if there are other criminal charges pending, why would ICE hold someone in detention rather than having them face those charges? Your Honor, you mean if there were not immigration criminal charges? Correct. Does that ever happen? Not that I'm aware of, Your Honor. I think a fair reading of the court's precedent so is that if there was collusion is the word that the case is used, that if, for example, authorities were trying to build a drug case and said to ICE, hey, can you just hold this guy until we prepare it, then of course that would be impermissible. That's not at all the situation that we have here. What's interesting is the conduct forming the basis for the criminal charges and the civil deportation is nearly identical. What you have here is an example of an immigration officer working diligently, immediately requesting the A file and then preparing the case for prosecution as soon as it arrived, consistent again with Tejada and Encarnacion. So we would argue that there simply is no Rule 5 violation in this case. And again, there's nothing to call into question the credibility of the databases that were used for probable cause here. Is there any circuit that disagrees with our Encarnacion and Tejada opinions? I can't represent that I've done an entire circuit review of those, but I do believe that it's fairly standard protocol what happened in this case in terms of moving from administrative and then to criminal custody in my reading of Encarnacion and Tejada as if they've been precedent in this court for a long time. And I certainly haven't seen anything in this circuit questioning them. So again, we don't believe that there was any basis to dismiss the indictment in this case. We would urge the court to affirm the Fourth Amendment decision as well. And again, I note, although we think there was no Fourth Amendment violation, the trooper's actions were entirely permissible. As Judge Tejada had questioned Mr. Andrews about suppression in this case would have an odd impact or really no deterrent effect given the continuing nature of an offense here. So there are many decisions from many circuits finding that suppression is just not appropriate in a case like this. We cited in our brief the Seventh Circuit's most recent decision, and I think it's Segoia-Morales. That was a 2017 decision where they worked through some of the Fourth Amendment issues and ultimately decided that it didn't need to reach those issues because of the continuing nature of the violation. Following up on Judge Tejada's colloquy, have there been instances in the federal courthouses in Maine where ICE agents have come into the courthouse and arrested people on their release from federal custody? I am not aware of any instances, Your Honor. If the court would like more information on that, I could certainly research it, but I'm not personally aware of that happening in the federal courthouse. Thank you. Thank you. Judge, just to follow up on your question, I'm aware of no other circuits that disagree with this court's rationale. But I would like to say that I don't think that collusion is limited to the notion that you, if someone from the local authorities asked immigration to hold them in administrative detention while they built a criminal case, that may be an instance of collusion. I think it's enough that there's collusion here. Trooper Burke called someone that he knew as Elliott who was an ICE agent. There's information on the record that he had done that at least three times before and that they knew each other well enough that they referred to each other on a first-name basis. I think that that's collusion. Collusion in the sense that a state trooper and a federal agent had a relationship such that when he stopped people who were non-white and didn't speak English, that he could call him and see what their immigration status was. The interesting thing about this is in the end they were only interested in Mr. Garcia-Zavala because everyone else in that van had some legitimate status that allowed them to be there working. The only person who didn't was Mr. Garcia-Zavala and he wasn't the driver. And he could have ostensibly walked away very early in that proceeding or in that stop and was told that he had to stay there by the state trooper. I think that's arrest. I don't think that's just detention. I think that's arrest. But they didn't know until they got information from the ICE databases that he had been removed or that he was illegally in the country. So that doesn't fit with your scenario. Well, the difference is that the seatbelt violation isn't a criminal violation and it's not the trooper who's investigating that and he's intentionally saying, yeah, I'm going to delay this. I mean, those were his words. I'm going to delay this as long as it takes. You're not suggesting that the policy of the U.S. Attorney's Office that they want the paper file A is evidence of collusion? I don't think that the paper file is evidence that is necessary for finding a probable cause. I think that that evidence was apparent when Mr. Garcia-Zavala said, yes, this is me, and I think that that was sufficient. The idea is that they held him in administrative custody while they tried to figure out what to do with him. And that is impermissible under Rule 5.  Thank you.